**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 14-10036-WGY-1** |
| | ) | |
| **ANTHONY PLEDGER,** | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On February 27, 2015, the defendant Anthony Pledger pled guilty to two counts of sex trafficking a minor in violation of 18 U.S.C. §1591, after Pledger intended to prostitute two young girls, aged 15 and 16 years old.   Sentencing is scheduled for May 28, 2015.   Pledger pled guilty pursuant to a binding Fed. R. Crim. P. 11(c)(1)(C) plea agreement, Pledger faces a mandatory sentencing range of 120 to 208 months.   The government respectfully requests that the Court accept the plea agreement and sentence the defendant to **208 months'** imprisonment, which is just below the low end of the applicable Sentencing Guidelines range, to be followed by a five year term of supervised release with associational restrictions.

**I.     THE CRIMES**

The Presentence Report in this case reads like any parent's worst nightmare.   Minor 2 was sixteen when she was using the website Tagged.com, which is a social media site, like Facebook, where users can meet other users.   Twenty-six year old Anthony Pledger met her there.   PSR ¶16.   Minor 2 told Pledger that she was 17, when in fact she was only 16.   Id. In spite of her age, Pledger quickly made his intentions clear.   The very day after meeting her online, Pledger attempted to recruit her for prostitution:

"**instead of fucking for free i kno ppl that will pay us**"

Id. at 18.

Minor 2 was not interested in prostitution.    Pledger shifted his attention to another victim: fifteen year old Minor 1.

Within days of meeting Minor 1 by phone and online, Pledger soon requested to meet Minor 1 after school.    On October 24, 2013, Pledger met Minor 1 at her friend's house Because Pledger was with co-defendant Miriam Kizzie, Minor 1 almost did not go with them. Id. at 24.    To her great regret, she did.    Pledger spent a day and a night with Minor 1, refusing to bring her home and twice having consensual sexual relations with her.    Id. at 26.

Events came to a head the next day, October 25, 2013.    Pledger and Minor 1 picked up Minor 2 – from high school – and the three went to Boston, where they reunited with Kizzie and his prostitute, KD, who was intended to encourage the girls to participate in prositution.    PSR ¶30.    Pledger planned to prostitute the girls that night.    Id.    He brought them to his apartment in Providence and began to prepare an advertisement for Backpage.com.    PSR ¶¶31-32. Pledger was planning to "set up shop" with Minor 1 when police, who had been trying to find Minor 1 since the previous day, intervened, rescued the victims, and arrested Pledger and Pledger's prostitute, ES.    PSR ¶¶33-36.    The last thing that Pledger said, after being advised of his right to remain silent:

> "I didn't do anything with them.    I didn't kiss them, hug them, touch them.    I didn't
> have sex with them."

Id. ¶36.

## II.    ADVISORY SENTENCING GUIDELINES ANALYSIS

The government adopts the Sentencing Guidelines analysis set forth in the Plea Agreement, and to which Pledger admitted at the change of plea hearing.[1]    Pledger is base

---

[1] Probation properly conducted its own investigation and found Pledger responsible for Minors 3 and 4, who were trafficked primarily by co-defendant Miriam Kizzie.    Pledger objects to those enhancements.    Consistent with its

offense level 30 for the attempted sex trafficking of Minor 1 pursuant to USSG §2G1.3(a)(2).

Two specific offense characteristics apply, each adding an additional two levels: first, the offense

involved the use of a computer, pursuant to USSG §2G1.3(b)(3); and second, the offense

involved the commission of a sex act, pursuant to USSG §2G1.3(b)(4)(A).   The adjusted

offense level for Minor 1 is **34**.   PSR ¶¶43-49.

The base offense level for the attempted trafficking of Minor 2 is also 30.[2]   A single two

level enhancement applies for the use of a computer, yielding an adjusted offense level of 32.

PSR ¶¶50-55.   Groups 1 and 2 count as one unit each, resulting in an additional two levels.

PSR ¶¶63-65.   The combined adjusted offense level is **36**.

The defendant receives three levels off for acceptance of responsibility, yielding a total

offense level of **33**.   At total offense level **33**, Criminal History Category **V**, the defendant's

advisory Guidelines Sentencing Range is 210 to 262 months.   Pursuant to the binding C plea

agreement, Pledger faces a sentencing range of 120 to 208 months.

### III.   18 U.S.C. § 3553(a) FACTORS

The government requests that the Court impose a sentence of imprisonment for **208**

**months**, which is just below the low end of the Guidelines Sentencing Range.   As discussed

below, a host of § 3553(a) factors – including the dangerousness of his crimes, his horrible

impact on his minor victims, his extensive criminal history, his gang affiliation and the

connection between sex trafficking and gang members, and comparison to other defendants who

have recently been sentenced in this district for similar crimes – demonstrate that only a sentence

of this length, while below the applicable Guidelines Sentencing Range, is sufficient but not

---

plea agreement with the defendant, the government does not seek to prove any additional enhancements beyond those
admitted in the Plea Agreement and at the change of plea hearing.
2  Each victim groups separately.   USSG §2G1.3(d)(1), App. n. 6.

greater than necessary to meet the goals of sentencing.

### 1.    Nature of the Offense

As with the co-defendant Kizzie, Pledger is a pimp who does not rely on brute force and threats, at least not at first.   Pledger displayed one of his recruitment methods here: trolling the internet.   It is all too easy for a pimp to solicit girls online.   As was the case here, it takes little time and virtually no effort.   And as soon as Pledger received no from Minor 2, he moved on to Minor 1.   Within a matter of days, Pledger had moved from meeting her to having her ready to have sex with strange men for money.   Thankfully, in this case, the police intervened before that last, awful step was taken.   But the fact that Pledger was ultimately unsuccessful does little to alter his own culpability for the actions that he had taken and intended to take.

Pledger's actions in this case are consistent with a technique commonly used by other pimps in urban environments – "finesse pimping" instead of "guerilla pimping."   See generally, Meredith Dank, PhD, Bilal Khan, PhD, et. al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major U.S. Cities*, Urban Institute Research Report, March 2014, available at http://www.urban.org/publications/413047.html at 167. Finesse pimps identify a girl or woman's emotional or economic needs, and their vulnerability to coercion or intimidation, and then they exploit those needs and vulnerabilities.   Id. at 166.

Pledger had been successful at finesse pimping in the past: he had already had a prostitute at home, ES.   PSR ¶¶28, 32, 34.   She waited at home while Pledger recruited additional prostitutes, and even provided the car that Pledger used.   PSR ¶24.   However, this case goes beyond serial pimping, although Pledger did that for years.   This case is really about targeting minor girls—fifteen and sixteen years old, sophomores in high school – for commercial sex.   Our society cannot, and will not, tolerate this exploitation of children, its most vulnerable members.

### 2.     Victim Impact

The victims here were children.    Pledger himself picked them up after school -- high

school, where they were sophomores.    Since the day that each of them met the defendant in

person, they have never been back to school.    That simple, tragic fact says everything about the

impact of these crimes on their victims.    Fortunately, thanks to the swift intervention of law

enforcement, they were never prostituted.    They may yet receive diplomas from alternative high

schools or their GEDs.    But they will never get those wonderful, awkward, momentous years of

high school back.    Ever.

These crimes were, in the words of the mother of one of the victims, a "very rough

ordeal.    Countless therapy visits, sleepless nights, and [her] daughter's ups and downs, thinking

he is going to come after and retaliate against her."    Victim Impact Letter, dated May 9, 2015,

attached as Ex. 3.    The last phrase speaks to the ongoing harm of this crime, as the victim fears

that the defendant will come after her again.    A long term of imprisonment, until the vicitms

have safely reached adulthood, is necessary to remediate that pain and concern.

### 3.     Defendant's Criminal History

The defendant's criminal history is serious, longstanding, and troubling.    While Pledger

is not a career offender, his record raises the same red flags, both for violence and serious,

constant recidivism.    Pledger has demonstrated again and again that he will reoffend and a

lengthy term of imprisonment is necessary to protect the public from him.[3]

His first arrest – for assault and battery with a dangerous weapon (bottle) – was at age

seven, and resulted in a CWOF and was eventually dismissed.    PSR ¶72.    At age 12, he was

---

[3] The government also submits as Exhibit 1 a detailed summary of Pledger's Boston Police Reports, which was prepared for a detention hearing.   Pledger agreed to a voluntary order of detention and the evidentiary hearing next went forward.

arrested again, for malicious destruction of property, for which he was adjudicated delinquent, and for assault and battery with a dangerous weapon (shod foot), for which was filed.    Id. ¶73. Starting at age 14, in quick succession, he was arrested for unarmed robbery (for which he was adjudicated delinquent); assault (adjudicated delinquent); assault and battery with a dangerous weapon (BB gun, for which he was adjudicated delinquent).    Id. ¶¶74-76.    In October 2002, at age 15, *three months* after being adjudicated delinquent, he was arrested for malicious destruction of property, which violated his probation and caused him to be committed to DYS custody.    Id. ¶77.    In August 2003, at age 16, he was arrested for possession of a class D controlled substance, which was CWOF'd.    Id. ¶8.    *Four days after that CWOF*, he was arrested again for possession of a firearm, ammunition and a class D substance; he was adjudicated delinquent again and committed to DYS custody until age 18.    Id. ¶9.

Less than one month after turning 18, the defendant resumed his criminal career.    He was arrested for possession of a class B substance, found guilty and sentenced to probation (which he later violated).    Id. ¶80.    In December 2005, still at age 18, the defendant was arrested for, and later convicted of, carrying a firearm without a license and without an FID card. The defendant was sentenced to two to two years in one day in prison and probation, which he later violated.    In this incident, Boston Police had responded to a shooting in the Grove Hall neighborhood.    Id. ¶81.

In March 2008, at age 20, the defendant was arrested for possession of a class D substance; he was convicted and sentenced to six months in jail.    He was also arrested for carrying a firearm without a license, which was nolle prossed after evidence was suppressed. Boston Police had again responded to a report of shots fired, this time at 90 Thetford Street.    Id. ¶82.

As the defendant continued into his twenties, he continued to break the law on a regular basis.   At age 21, he committed assault and battery (which was originally charged as assault and battery on a correctional officer).   PSR ¶83.   At age 22, in separate incidents, he operated a motor vehicle without a license and illegally possessed a knife; trespassed; committed shoplifting by asportation; and operated a motor vehicle with a suspended license again.   PSR ¶¶84-87.

### 4.   Gang Affiliation

The government contends that Pledger, like Kizzie, is a member of the Thetford Avenue Buffalos.   PSR ¶9; see also Detention Aff., filed March 20, 2013 [dkt. no. 31], ¶5, a copy of which is attached as Exhibit 2.   Pledger's criminal history is replete with violence in concert with other members of the Thetford Avenue Buffalos, as detailed in Exhibit 1.   For example, on June 2, 2013, he was shot by Anthony Howard, in what police believe was a gang related shooting.   Ex. 1 at pp. 70-72.

Defendant has been present for other, suspected gang-related shootings.   For example, on March 18, 2010, Pledger and his brother Nicco, also a Thetford Ave member, were present when Raheem Browder and Thetford Ave member Marquis Browder were shot.   Nicco Pledger told police, "I don't know what happened we just came out of the store and they started shooting.   Id. at pp. 51-57.   Witnesses reported that there had been an exchange of gunfire that night.   Id. After executing a search, police arrested Pledger for assault with a dangerous weapon, possession of a firearm, carrying a loaded firearm, and discharging a firearm within 500 feet of a house; those charges were nolle prossed.   Id.; PSR ¶97.

On March 25, 2008, the defendant was arrested with marijuana and a firearm after police responded to a call of shots fired at 90 Thetford Avenue, which had previously been the scene of gang related violence.   Ex. 1 at pp. 46-47; PSR ¶82.   At booking, Pledger said that he had gone to

the park "for [his] boy," which police believed to be a reference to Andre Stone, whose birthday

was March 27.   Pledger had been present when Stone was shot and killed in the same place on

September 18, 2005, in what the police believe was an act of gang violence.   Ex. 1 at pp. 37-39.

On May 16, 2012, the police responded to shots fired at the corner of Wayland Street and

Howard Avenue and encountered the defendant and his brother, Thetford Ave member Nicco

Pledger, who refused to cooperate with police.   Id. at 59.   Finally, on November 4, 2005, police

responded to a call of shots fired.   The caller had stated that the shooters had returned to the area

to recover ballistic evidence.   Police met the defendant, Raheem Browder (the man who had been

shot in the defendant's presence on March 18, 2010), and Thetford Ave member Lorenzo Jones.

In addition to these shootings, Pledger was arrested or stopped with Thetford Ave members

on other occasions.   For example, on February 23, 2013, he was arrested for operating after

revocation with member Troy Royal also in the car, which charge was dismissed.   Id. at 68; PSR

¶101.   On August 7, 2012, police saw Thetford Ave associate Dwayne Flonory shot a gun at the

same Thetford Avenue park.   Police stopped the car in which Flonory had been riding; also in the

car were the defendant and member Troy Royal.   Ex. 1 at pp. 63-65.   On July 16, 2012, Pledger

was arrested for operating after suspension with member Troy Royal, which charge was dismissed.

Id. at p. 62; PSR ¶99.   As far back as February 6, 2002, at age 14, Pledger was arrested for assault

in the company of Thetford Ave member David Adams; he was later adjudicated delinquent for

that charge.   Id. at pp. 16-17; PSR ¶75.

Pledger's gang activity by itself is significant factor which threatens the public and calls for

a long term of imprisonment   See Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among

Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang

membership, even within a high-risk sample, emerged as a significant predictor of recidivism as

more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"); Kennedy, "Deterrence and Crime Prevention: Reconsidering the Prospect of Sanction (Routeledge Studies in Crime and Economics 2009), p. 78 ("There is an embarrassment of riches on the high rate of gang offending"); United States v. Johnson 184 Fed. Appx. 746, 748 (10th Cir. 2006)(at sentencing, gang membership was "significant" and appropriate for inclusion in the PSR because. . . . "gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens"); United States v. Aguirre-Roche, 305 Fed. Appx. 567 (11th Cir. 2008)(district court properly considered defendant's gang membership at sentencing).

Perhaps even more troubling in this case is the growing connection between gang activity and sex trafficking.   As discussed in the affidavit, there has been an increase in sex trafficking activity by gang members, who perceive that it is less likely to result in criminal prosecution than drug or gun activity.   Ex. 2 (Detention Aff.), ¶8.   This dangerous perception must be changed. This case illustrates how gang members can assist each other in providing support in a variety of activities, including those related to sex trafficking.   Pledger's membership in the Thetford Avenue Buffalos made it easier for him to commit his crimes, and a significant term of incarceration will send an important message to members of that group and other gangs that the exploitation of girls and women is a serious crime, not a promising new source of revenue to gang members.

###    5.    Comparison to Other Defendants

A sentence of 208 months is consistent with other recent sentences for sex trafficking, in this session and other sessions of this Court.   For example, on May 11, 2015, co-defendant Miriam Kizzie received a sentence of 153 months imprisonment, which was the middle of his

guidelines range and the top of his C plea range.    While the impact of Kizzie's successful

criminal conduct was worse, Pledger was ready and intended to do exactly the same thing when

the police fortunately rescued the victims.    Police intervention does not reduce Pledger's

culpability for the crimes that he committed and intended to continue.    What separates Pledger

from Kizzie is Pledger's far, far worse criminal history, which is Category V (to Kizzie's

Category I) and replete with violence and gang activity.    As a result, the advisory Sentencing

Guidelines range for Pledger is 210 to 262 months.    Similarly, on October 9, 2014, this session

of the Court sentenced David Minasian to 180 months imprisonment for sex trafficking a single

underage victim.    Cr. No. 13-10099-WGY-1.

## IV.    SUPERVISED RELEASE

The parties agree that the defendant should be on supervised release for five years.    The

government also requests that the defendant be subject to certain special conditions throughout

that period.    The first (and from the government's perspective) most important of these conditions

is associational restrictions that will keep the defendant away from his Thetford Avenue

Associates.[4]    See PSR at 9.    It is those people who are the subject of the proposed restrictions,

attached as Addendum A.

> The rationale for such restrictions couldn't be simpler:

> Recidivism is due to offenders' retaining criminogenic motivation or propensity and their having access to opportunities for crime. Thus, to reduce re-offending, an important task for a probation or parole agency is to provide or place offenders into treatment programs, based on the principles of effective rehabilitation, that diminish their propensity for crime. *The other task, however, is for probation and parole officers to reduce offenders' access to crime opportunities.*

Cullen et al., "Environmental Corrections–A New Paradigm for Effective Probation and Parole

---

4 Although often the case in gang cases, the government is not requesting geographic restrictions as well because Pledger had already moved from the Thetford Avenue neighborhood – although he had not disassociated himself from his Thetford Ave associates.

Supervision" 66 Federal Probation 28 (2002) (hereinafter referred to as "Cullen")(emphasis

supplied).   Because both the literature and common sense show that opportunities for crime will

be presented whenever a defendant returns to the area in which his offending began and grew (and

in which his street credentials and sense of self may have been based on that very criminality),

removing him from those associations will reduce both the opportunities for further crime and the

expectation from those around him that he will re-offend.   Thus, "[t]he effectiveness of probation

and parole supervision will be increased to the extent that officers systematically. . . reduce the

extent to which offenders are tempted by and come into contact with opportunities for crime."   Id.

at 31. See also La Vigne et al., "Prisoner Reentry and Community Policing: Strategies for

Enhancing Public Safety," Washington D.C.: Urban Institute Justice Policy Center, Mar. 2006, at

25 ("most potential offenders are not highly motivated to commit crime but do so when they are

presented with opportunities to offend easily."); Dickey et al, Promoting Public Safety: A

Problem-Oriented Approach To Prisoner Reentry in Prisoner Reentry and Community Policing:

Strategies for Enhancing Public Safety, Washington D.C.: Urban Institute Justice Policy Center,

May 2004, at 61-62 ("when offenders first reenter communities, they themselves are vulnerable,

for all of the reasons that have been suggested in literature on reentry: mental health problems, lack

of family connections, drug and alcohol addictions, lack of education and employment. . .Fixing'

these problems is often implausible. . . .Instead, we can alter environments [and] remove

temptations. . . ").

      As commonsensical as these notions are, effective implementation is equally

straightforward.   Rather than the rely on the sweeping provisions set forth in U.S.S.G. §5D1.3

(which are seldom invoked in revocation proceedings precisely because they are so broad),[4] the

literature suggests that narrower restrictions are more effective--restrictions precluding the

defendant from being with particular people or specific areas that the record shows have

previously led him into crime.     Cullen at 33 (recommending that probation officers attempt "to

disrupt routine activities that increase crime opportunities" that are based on the defendant's past

offending by, among other things, prohibiting contact with specific people (e.g., past co-offenders)

and "prohibiting traveling on specific streets" (e.g., areas of past criminality outlined on a map

given to the offender). That is exactly what the government seeks to do here.

Courts have routinely upheld associational restrictions as a condition of probation or

supervised release whenever, as here, the restriction served as a deterrent to protect the victimized

community and/or rehabilitate the defendant.   See United States v. Garrasteguy, 559 F.3d 34 (1st

Cir. 2009) (affirming on plain error review 12-year restriction from Suffolk County imposed on

defendant who sold drugs at Bromley Heath Housing Development); United States v. Watson, 582

F.3d 974 (9th Cir. 2009)(validating restriction that prevented defendant from entering city and

county of San Francisco without the prior approval of his Probation Officer); United States v.

Cothran, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented defendant,

convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia because his

return to a high-crime neighborhood in southeast Atlanta would likely result in his continued

criminal activity and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d

289, 292 (3d Cir. 2000) (upholding a supervised release restriction, after various drug convictions,

that covered two counties in the Allentown, Pennsylvania area because the "territorial limitation

---

[4]These "standard conditions" routinely incorporated into Judgments of Conviction include restrictions such as ordering that the defendant not to frequent "places where controlled substances are illegally sold, used or administered" that are so broad so as to be of little use in all but the most unusual case.

[was] clearly intended to promote [defendant's] rehabilitation by keeping [defendant] away from the influences that would most likely cause her to engage in further criminal activity"). See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of supervised release that required defendant to live in city several hundred miles away from family for first 12 months of supervised release; court noted that condition: (a) "will further [defendant's] rehabilitation efforts by temporarily removing him from the destructive influences that have plagued him;" and (b) "holds the potential to protect the community from future crimes as well").

The requested restrictions should also be imposed here because the need for them is fully supported by the record.   The restrictions are based on Pledger's prior criminal contacts as shown on historic Boston Police Department Reports.   In fact, the historic Incident Reports attached as Exhibit 1 demonstrate that the proposed restrictions incorporate many individuals with the defendant when those incidents took place.   See Ex. 1.   Accordingly, the government requests that the Court adopt the associational restrictions in Addendum A, all members of the Thetford Avenue Buffalos according to the Boston Regional Intelligence Center.   In light of family associations, the government has not included the defendant's brother who are also members of the gang.

## V.    THE GOVERNMENT'S RECOMMENDATION

For the reasons stated above, the government requests that the Court impose the following sentence:

- a sentence of imprisonment for a term of 208 months;

- no fine because it appears that the defendant is unable to pay a fine;

- supervised release for a term of 60 months, with the requested associational restrictions as set forth in Addendum A; and

- a $200 special assessment.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:   s/ Timothy E. Moran
TIMOTHY E. MORAN
AMY HARMAN BURKART
Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

I, Timothy E. Moran, Assistant U.S. Attorney, certify that I caused a copy of the foregoing sentencing memorandum to be served by efiling on all counsel of record and a copy of attachment A to this memorandum to be served by first class mail on all counsel of record.

s/ Timothy E. Moran
Timothy E. Moran
Assistant U.S. Attorney

Dated: September 21, 2015

## Addendum A

### List of Associational Restrictions

| | |
|---|---|
| David Adams | Brian Joyce |
| Marquis Browder | Mirian Kizzie |
| Shaquille Browder | Paul Lacet |
| Jonathan Brown | Kenny Lamour |
| Shaquille Brown | Justin Liburd |
| Michael Browne | Jamal Martin |
| Nigel Browne | Ashawda Nelson |
| Travaun Daley | Ricky Norwood |
| Valdyny Dossantos | Christopher Pounds |
| Chad Easter | Kembron Roache |
| Randy Edwards | Troy Royal |
| Prince Fitzpatrick | Ervin Stephen |
| Dayshawn Grant | Steve Stephen |
| Adrian Hutchins | Roniel Street |
| Lorenzo Jones | Richie Williams |
| Thomas Jones | |